Timothy A. Nelson (Arizona Bar No. 016274)
**The Nelson Law Group, PLLC**
21 West Coolidge Street
Phoenix, Arizona 85013
(602) 421-2681

John W. Leardi (*application forthcoming*)
Frank X. Wukovits (*application forthcoming*)
Elizabeth A. Rice (*application forthcoming*)
**Buttaci Leardi & Werner LLC**
212 Carnegie Center, Suite 202
Princeton, New Jersey 08540
(609) 799-5150

*Attorneys for Plaintiffs*
*and the Proposed Class*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| DR. TIMOTHY MUNDERLOH, DR. TRAVIS STIEGLER, and MUNDERLOH MEDICAL, INC., *on behalf of themselves and on behalf of all others similarly situated*, <br><br> Plaintiffs, <br><br> - v. – <br><br> BIEGLER GMBH; SOLACE ADVANCEMENT, LLC; DOC SOLUTIONS, LLC; MARK KAISER; ELIZABETH O'NEILL; TITAN MEDICAL COMPLIANCE, LLC; DR. TIMOTHY WARREN; ABC CORPS. 1-50; and JOHN DOES 1-50, <br><br> Defendants. | Civil Action No.: CV _____ <br><br><br> **CLASS ACTION COMPLAINT** <br><br> *Jury Trial Demanded* |

Plaintiffs Dr. Timothy Munderloh, D.C. ("Dr. Munderloh"), Dr. Travis Stiegler,

D.O., ("Dr. Stiegler"), and Munderloh Medical, Inc. d/b/a/ Munderloh Integrated Medical

("Munderloh Integrated Medical") on behalf of themselves (collectively, "Plaintiffs") and on behalf of all others similarly situated (the "Proposed Class" defined herein), by and through their undersigned attorneys, based upon personal knowledge as to themselves and their own acts, and as to all other matters upon information and belief formed after an inquiry reasonable under the circumstances, for their Class Action Complaint against Biegler Gmbh ("Biegler"); Solace Advancement, LLC ("Solace Advancement"); Doc Solutions, LLC ("Doc Solutions"); Mark Kaiser ("Kaiser"); Elizabeth O'Neill ("O'Neill"); Titan Medical Compliance, LLC ("Titan Medical"); Dr. Timothy Warren, D.C. ("Dr. Warren"); ABC Corps. 1-50; and John Does 1-50 (collectively, "Defendants") hereby allege as follows:

## I.      INTRODUCTION

1.      Dr. Munderloh, Dr. Stiegler, and Munderloh Integrated Medical are only a few among many medical professionals and facilities (collectively "medical providers") who make up the Proposed Class and who have fallen victim to what shall be referred to as the "Stivax Coding Scheme" of the "Stivax System Enterprise" comprised of the Defendants.

2.      Through the Stivax Coding Scheme, the Plaintiffs and members of the Proposed Class were sold a purported implantable medical device known as the Stivax System (the "Stivax device"), which in reality was merely an electro-acupuncture device. The Defendants—on behalf of the Stivax System Enterprise—misrepresented, actively concealed, and disseminated fraudulent information and instructions concerning the Stivax device, including but not limited to how to bill and collect health insurance reimbursements

from Medicare.

3.    The Stivax device is "a single use, battery-powered, electrical nerve stimulator which is used for the stimulation of the vagus nerve via the ear." *See* FDA 510(k) Summary and Letter K152571, dated May 26, 2016, attached as <u>Exhibit 1</u>. "The device connects an electrode cable to two sterile (radiation) acupuncture needles that have been applied by a healthcare practitioner." *Id.*

4.    However, the Stivax device was cleared by the Food and Drug Administration ("FDA") in 2016 merely for use in acupuncture—***not*** an implantable medical device. In the 510(k) premarket notification of intent submitted to the FDA, Biegler explicitly described the device as an "electro-acupuncture device" adhering to the patients, behind the ear "with tape" for use exclusively "in the practice of acupuncture by qualified practitioners of acupuncture." *Id.*

5.    The Stivax device was sold and marketed throughout the United States by sales-agent distributors ("Sales Agents") on behalf of the Stivax System Enterprise, including but not limited to Solace Advancement, Doc Solutions, Mark Kaiser, ABC Corps. 1-50, and John Does 1-50.

6.    The Stivax device and efforts of the Sales Agents were supplemented and furthered by entities holding themselves out to be billing, coding, and compliance experts ("Coding Agents") who gave fraudulent coding and billing instructions on behalf of the Stivax System Enterprise, including but not limited to Titan Medical Compliance, Dr. Warren, ABC Corps. 1-50, and John Does 1-50.

7.    Upon information and belief, Defendants invested substantial sums in

advertising and marketing the Stivax device throughout the United States as a reimbursable non-narcotic implantable medical device—rather than an electro-acupuncture device that is not reimbursable by Medicare—on websites, at trade shows, in brochures, in newsletters, in videos, on teleconferences and phone calls, and in on-site presentations at physician offices and ambulatory surgery centers.

8.     At the core of the Stivax Coding Scheme, the Defendants conceived of promoting the Stivax device as billable to Medicare under a specific set of medical billing codes, using certain Healthcare Common Procedure Coding System ("HCPCS") codes and Current Procedural Terminology ("CPT") codes. HCPCS and CPT codes are the national standard for how medical professionals document and report medical, surgical, radiology, laboratory, anesthesiology, and evaluation and management services. All healthcare providers, payers, and facilities (including Plaintiffs and members of the Proposed Class) use these codes. These codes are used by insurers to help determine the amount of reimbursement that a practitioner will receive for the services provided. The codes are developed, maintained, and copyrighted by the American Medical Association ("AMA"), and are mandatory under the transaction standards promulgated under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") for reporting the performance of medical procedures when submitting electronic billing. In short, HCPCS and CPT codes serve as the uniform language of medical procedures utilized by all providers and payers, including Plaintiffs and members of the Proposed Class.

9.     To entice medical providers to purchase their Stivax devices, the Defendants promoted the billing of the Stivax device as a reimbursable implantable non-narcotic pain

4

management medical device under a particular set of HCPCS codes and CPT codes reserved for billing *implanted* neurostimulator devices. However, at all times known to Defendants but unbeknownst to Plaintiffs and members of the Proposed Class, these codes were improper because the Stivax device is *not* an implantable medical device but merely a *percutaneous* electro-acupuncture device, rendering the Stivax device ineligible for reimbursement by health insurance payors and Medicare. This was the primary fraud fueling the Stivax Coding Scheme.

10.     As a result of their reimbursement-driven marketing scheme for the Stivax System Enterprise, Defendants sold tens of thousands of Stivax devices throughout the United States and touted itself as the market leader of the purported industry.

11.     Defendants instructed medical providers—including Dr. Munderloh, Dr. Stiegler, and Munderloh Integrated Medical—how to bill Medicare and other government healthcare payors for the Stivax device using codes that they knew to be improper for the Stivax device to specifically buttress the Stivax System Enterprise's efforts.

12.     Defendants deliberately made misrepresentations with regard to the correct billing, coding, and reimbursement of the Stivax device, and intended or had reason to expect that the substance of these misrepresentations would be communicated and repeated to Plaintiffs and members of the Proposed Class through sales and marketing representatives of the Stivax System Enterprise. Defendants also intended or had reason to expect this would induce Plaintiffs and members of the Proposed Class to rely upon the misrepresentations of the Stivax System Enterprise, which Plaintiffs and members of the Proposed Class did, indeed, justifiably rely upon to their detriment.

13.     Unaware of Defendants' motives and schemes, Plaintiffs and members of the Proposed Class have used these codes as instructed and, consequently, have experienced significant financial and legal harm.

14.     Plaintiffs bring this action on behalf of members of the Proposed Class who suffered harm based on their reliance upon the Stivax Coding Scheme utilized by Defendants to deliberately conceal and misrepresent the correct billing, coding, and reimbursement information for the Stivax device. Plaintiffs' transactions involving the Stivax device were neither unique nor isolated, such that Plaintiffs represent a Proposed Class of fellow medical providers who were also sold the Stivax device based on fraud and misrepresentation by the Defendants for the Stivax System Enterprise.

## II.     JURISDICTION AND VENUE

15.     This Court has federal question jurisdiction over this matter as it arises out of violations of federal statutes, including specifically 18 U.S.C. § 1962(c).

16.     This Court also has subject matter jurisdiction over this class action pursuant to 28 U.S.C. § 1332 as amended by the Class Action Fairness Act of 2005 because the matter in controversy exceeds $5,000,000.00, exclusive of interest and costs, and is a class action in which some members of the Proposed Class are citizens of states different than Defendants. *See* 28 U.S.C. § 1332(d)(2)(A).

17.     This Court also has personal jurisdiction over Defendants because they are authorized to do business and in fact do business in this state and District, and/or Defendants have sufficient minimum contacts with this state and District, and/or Defendants otherwise intentionally avail themselves of the markets in this state and District

through the promotion, marketing, and sale of the Stivax device in this state, which renders the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

18.     Venue is proper in this District under 28 U.S.C. § 1391. Defendants do substantial business in this state and within this District, advertise in this state and within this District, receive substantial compensation and profits from the sale of the Stivax device in this state and within this District, and engaged in deliberately misleading representations concerning the correct billing, coding, and reimbursement for the Stivax device in this state and within this District to subject Defendants to *in personam* jurisdiction in this District. Furthermore, the transactions between Defendants and the named Plaintiffs occurred in this state and within this District.

## III.    THE PARTIES

19.     Dr. Timothy Munderloh, D.C., is a Board-Certified Chiropractic Physician specializing in neurology and practicing in Flagstaff, AZ. Dr. Munderloh attended the University of Nebraska at Lincoln majoring in pre-medicine and graduated from Northwestern College of Chiropractic (now Northwestern Health Sciences University) in Minneapolis in 1998. Dr. Munderloh completed post graduate education in chiropractic neurology. Dr. Munderloh is also a Diplomate of the International Board of Chiropractic Neurology ("D.I.B.C.N."). He is the founder and President of Munderloh Integrated Medical.

20.     Dr. Travis Stiegler, D.O., is an Osteopathic Physician who is skilled in neuromusculoskeletal medicine and specializes in non-narcotic therapies for patient pain.

Dr. Stiegler completed medical school at Midwestern University in Arizona in 2007, followed by a psychiatry residency at Maricopa County Hospital, as well as a Child & Adolescent Psychiatry fellowship. He is a practitioner at Munderloh Integrated Medical.

21.     Munderloh Integrated Medical is an Arizona for-profit corporation that is recognized as one of the largest non-narcotic, integrated medical rehabilitation-based clinics in Northern Arizona. Offering a variety of pain-relieving options to assist its patients, Munderloh Integrated Medical is located at 1501 S Yale St. #250, Flagstaff, AZ 86001.

22.     Biegler is an Austrian company, which at all relevant times herein, was and is engaged in the manufacturing and marketing of the Stivax device, as more fully described herein, throughout the state of Arizona and the United States, with its principal place of business of Allhangstrasse 18a, 3001 Mauerbach, Austria.

23.     Solace Advancement is a Michigan Limited Liability Company, which at all relevant times herein, was and is engaged in the importation, marketing, and distribution of the Stivax device, as more fully described herein, with a principal place of business of 26711 Woodward Ave, Suite 211, Huntington Woods, MI 48070.

24.     Doc Solutions is a Florida Limited Liability Company, which at all relevant times herein, was and is engaged in the marketing and distribution of the Stivax device, as more fully described herein, throughout Arizona and the United States, with a principal place of business of 6160 State Road 70 E #103, Bradenton, FL 34203, and a mailing address of 1767 Lakewood Ranch Blvd. #326, Bradenton, FL 34211.

25.     Kaiser is the Chief Executive Officer, National Account Manager, and one

of two owners of Doc Solutions. Upon information and belief, Kaiser resides at 16617 5th Avenue East, Bradenton, FL 34212.

26.     O'Neill is an Authorized Member and one of two owners of Defendant Doc Solutions and is authorized to manage and control Doc Solutions. Upon information and belief, O'Neill resides at 16617 5th Avenue East, Bradenton, FL 34212.

27.     Titan Medical Compliance is a Kansas limited liability which at all relevant times herein, was and is peddling fraudulent and improper coding sequences and protocols comprising the Stivax Coding Scheme on behalf of the Stivax System Enterprise, throughout the state of Arizona and the United States, with a registered office of 1415 W. 31st South, Wichita, Kansas 67217.

28.     Dr. Warren is the Director and Owner of Titan Medical Compliance who at all relevant times herein, was and is engaged in providing fraudulent and improper coding sequences and protocols pursuant to the Stivax Coding Scheme. Upon information and belief, Dr. Warren resides at 702 Chelsea Street, Haysville, Kansas 67060-7467.

29.     Defendants ABC Corps. 1-50 and John Does 1-50 are corporate entities and individuals within the Stivax System Enterprise who have not yet been identified, but are known to Biegler, Solace Advancement, Doc Solutions, Kaiser, O'Neill, Titan Medical Compliance, and/or Dr. Warren.

## FACTS COMMON TO ALL COUNTS

### A. The P-Stim Device.

30.     The origin of the Stivax System Enterprise spawned from Biegler's predicate device, the P-Stim System ("the P-Stim device").

31.     On January 17, 2005, U.S. distributor NeuroScience Therapy Corp.—on behalf of Biegler—submitted a premarket notification of intent to market the FDA for the P-Stim device. *See* FDA 510(k) Summary and Letter K050123, dated March 30, 2006, attached as Exhibit 2.

32.     As described in the 510(k) Summary in detail, "[t]he P-Stim device is a miniaturized, battery-powered, transcutaneous electrical nerve stimulator that has a pre-programmed frequency, pulse, and duration for the stimulation of auricular acupuncture points." *Id.* Listed under "Indications For Use," the 510(k) identifies the P-Stim device as "an electro-acupuncture device for use in the practice of acupuncture by qualified practitioners of acupuncture as determined by the states." *Id.*

33.     On March 30, 2006, the FDA determined the P-Stim device was the substantial equivalent to other legally marketed predicate devices, thereby allowing Biegler to market the P-Stim device "as described in [Biegler's] Section 510(k) premarketing notification." *Id.*

34.     Subsequently, Biegler began to manufacture and distribute the P-Stim device through a licensing arrangement with DyAnsys, Inc. ("DyAnsys"). Srini Nageshwar ("Nageshwar")—principal of DyAnsys—applied to the Centers for Medicare and Medicaid ("CMS") for the creation of a HCPCS Code for the P-Stim device in May of 2013 because an appropriate HCPCS code did not exist for devices such as the P-Stim device. CMS scheduled the code request for a hearing on May 29, 2013, during a HCPCS Public Meeting as Agenda Item #6.

35.     On May 23, 2013, Biegler discovered Nageshwar's HCPCS application and

vehemently objected to the HCPCS code application. Biegler averred that Nageshwar was neither the manufacturer of the P-Stim device nor authorized by Biegler to submit a HCPCS application for the P-Stim device. *See* Letter from Ingeborg Biegler, Managing Director of Biegler, dated May 23, 2013, attached as Exhibit 3. As a result, Biegler requested that CMS remove the HCPCS code application for the P-Stim device from the May 29, 2013 Agenda, stating it is Biegler's "intention to pursue a HCPCS code at some future time when we are ready to do so[.]" *Id*. As a result, the Agenda item was removed and no decision was rendered.

36.     Thereafter, Biegler terminated its relationship with DyAnsys and entered into a distribution and licensing arrangement with Innovative Health Solutions, Inc. ("IHS") and Eagle Advancement Institute to distribute the P-Stim device in the United States.

37.     On March 28, 2014, Biegler engaged Paul Dryden—President of ProMedic, Inc. ("ProMedic")—to submit another premarket notification of intent to market the P-Stim device. *See* FDA 510(k) Letter K140788, dated June 27, 2014, attached as Exhibit 4.

38.     While 510(k) K140788 for the P-Stim device was pending, upon information and belief, Biegler orchestrated the submission of Agenda Item #14 to the CMS HCPCS Public Meeting Agenda on May 28, 2014: "Request to establish a new level II HCPCS code to identify an auricular point stimulation (Electro-Acupuncture Stimulator) device, trade name: P-STIM." *See* CMS HCPCS Public Meeting Agenda for Supplies and "Other," dated May 28, 2014, attached as Exhibit 5. During this Public Meeting, CMS's preliminary coding decision stated: "Based on our preliminary benefit category analysis, we believe that there would be no Medicare payment for this item." *Id.*

39.     As of May 28, 2014, Biegler, IHS, and Eagle Advancement Institute had notice that P-Stim device was not reimbursable by Medicare.

40.     On June 27, 2014, after CMS issued its preliminary decision rejecting Medicare reimbursement for the P-Stim device, the FDA determined that the P-Stim device was the substantial equivalent to legally marketed predicate devices prior to May 28, 1976, or other reclassified devices, so Biegler was able to market the P-Stim device. *See* Exhibit 4.

41.     Upon information and belief, in November of 2014, Biegler directly or through ProMedic received CMS's final decision that there would be no HCPCS code added and, therefore, no Medicare reimbursement for the P-Stim device.

42.     On October 22, 2015, the Durable Medical Equipment Medicare Administrative Contractors ("DME MAC") issued a public Joint DME MAC Publication, titled "P-stim® Device – Correct Coding," stating:

> Recently the DME MAC contractors have received inquiries about the P-stim® auricular stimulation device (Biegler GmbH). The P-stim® is a miniaturized electro-acupuncture device for use in the practice of acupuncture by qualified practitioners of acupuncture. It provides auriculo-point stimulation treatment over several days. ***This item is not reimbursable by Medicare.*** Claims submitted to the DME MACs for the P-Stim® device must be coded A9270 (Noncovered item or service).

*P-Stim Device Correct Coding*, Joint DME MAC Publication (October 22, 2015), https://www.cgsmedicare.com/jb/pubs/news/resrc/cope695-033.html, attached as Exhibit 6 (emphasis added).

43.     Without ambiguity but rather crystal clarity, CMS's November 2014 final decision and the October 2015 Joint DME MAC Publication gave Biegler actual notice

that the P-Stim device was not reimbursable by Medicare, and any Medicare claim submitted for a HCPCS code other than code A9270 (Noncovered item or service) would be contrary to CMS's express direction.

**B. Introduction of the Stivax Device.**

44.　Shortly after the Joint DME MAC Publication issued on October 22, 2015, Biegler developed and sought to market the Stivax device.

45.　On April 24, 2016, Paul Dryden of ProMedic—authorized by and on behalf of Biegler—submitted 510(k) K152571 premarket notification of intent to market the Stivax device. *See* Exhibit 1. The 510(k) Summary identified the P-Stim as the predicate device to the Stivax device, whereby "[t]he Stivax System from Biegler was compared to the predicate P-Stim System – K140788." *Id*. It was determined that although there were "some differences between the [Stivax device] and the predicate P-Stim (K140788)," the FDA determined the indications for the Stivax device were "identical to the predicate." *Id.* In fact, just as in FDA 510(k) Letter K140788, FDA 510(k) Letter K152571 explicitly identifies the Stivax device as "an electro-acupuncture device for use in the practice of acupuncture by qualified practitioners of acupuncture as determined by the states." *Id.*

46.　Just as important; neither the premarket notification of intent to market nor FDA declared the Stivax device as an implantable device pain management device. *Id.*

47.　On May 26, 2016, the FDA approved Biegler to market the Stivax device as the substantial equivalent of the P-Stim device. *Id.*

**C.　The Dawn of the Stivax System Enterprise.**

48.　The Stivax System Enterprise is an association-in-fact "enterprise" entity

within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), made up of Biegler, Solace Advancement, Doc Solutions, Kaiser, O'Neill, Titan Medical, Dr. Warren, ABC Corps. 1-50, and John Does 1-50.

49.     Referred to as the Stivax Coding Scheme, the purpose of the Stivax System Enterprise is to conspire, induce, and execute the sale of the Stivax device to medical providers and facilities, such as Dr. Munderloh, Dr. Stiegler, and Munderloh Integrated Medical, located throughout the United States through fraudulent concealment and misrepresentation that the Stivax was an implantable medical device reimbursable by Medicare.

50.     Upon information and belief, while a hierarchy need not be established to bring claims against the associates of an enterprise, Biegler reigned at the top of the hierarchy of the Stivax System Enterprise. Biegler is the manufacturer of the Stivax device and responsible for the FDA approval to market the Stivax device in the United States. Biegler knowingly misrepresented the Stivax device as reimbursable by Medicare to Plaintiffs and members of the Proposed Class through the Stivax Coding Scheme of the Stivax System Enterprise.

51.     Biegler engaged Solace Advancement as the U.S. importer and distributor for the Stivax device. Solace Advancement is owned and operated by James Carpenter, who also owns and operates Eagle Advancement Institute.

52.     Both Biegler and Solace Advancement then contacted and contracted with other distributors, such as Doc Solutions and ABC Corps., to further market and sell the Stivax device across the United States.

53.     Together, Solace Advancement and Doc Solutions promoted, marketed, distributed, and knowingly concealed and misrepresented the proper use, description, coding, and billing of the Stivax device. In relevant part, Solace Advancement and Doc Solutions are responsible for the sales and distribution of the Stivax device throughout the United States. Kaiser—Doc Solutions' Chief Executive Officer and National Account Manager—personally promoted, marketed, and sold the Stivax device throughout the United States to providers, including Plaintiffs in the state of Arizona.

54.     Specifically, Kaiser visited Munderloh Integrated Medical and bragged to Dr. Munderloh and Dr. Stiegler that he was personally tapped by Biegler to not only perform research and develop the Stivax device but also sell the device on behalf of Biegler and the Stivax System Enterprise as part of his teleconferences, phone calls, and on-site presentations at healthcare facilities.

55.     As a general matter, it is the industry norm for distributors of medical devices to train, educate, and instruct purchasing providers and facilities with regard to not only the application of the devices themselves but also the methods and means of coding and billing for the devices. Likewise, because a distributor's understanding of reimbursement of a device that he or she distributes is often superior to a medical provider's understanding, it follows that it is the industry norm for Plaintiffs to follow and adhere to the application, coding, and billing instructions provided by both the Stivax System Enterprise's Sales Agents (under the guise of medical device distributors) as well as Coding Agents (holding themselves out to be compliance and billing experts) who are partnered with or otherwise introduced to the Plaintiffs by the Sales Agents.

56.     Specifically, to assist in the distribution and sale of the Stivax device, the Coding Agents held themselves out to be coding and billing compliance organizations and personnel to further execute the Stivax System Enterprise's fraudulent concealment and misrepresentations as part of the Stivax Coding Scheme. Prior to and subsequent to the sale of the Stivax device to medical providers, these Coding Agents reiterated which codes the providers must use to bill the Stivax device.

**D. Dr. Munderloh and Dr. Stiegler Introduction to the Stivax Coding Scheme.**

57.     On September 8, 2016, Kaiser visited Munderloh Integrated Medical and made a presentation to Dr. Stiegler and Dr. Munderloh regarding the Stivax device. *See* Stiegler-Kaiser Email Chain, dated September 9, 2016, attached as <u>Exhibit 7</u>. Upon information and belief, Kaiser had expressed that the previous devices (ANSiStim and P-Stim device) Doc Solutions and his fellow distributors had previously sold through DyAnsys were "not compliant," hence Kaiser's transition to the purportedly compliant Stivax device.

58.     Upon information and belief, Kaiser had expressed that both he and Dr. Warren had spoken with Medicare and healthcare lawyers regarding the billing, coding, and compliance of the Stivax device and expressed that both the Stivax device and billing codes he offered were compliant with CMS's standards for reimbursement.

59.     Upon information and belief, Kaiser had also expressed that an acupuncturist could not purchase the Stivax device because the Stivax device was intended for medical providers as a medical device.

60.     On September 9, 2016, Dr. Stiegler followed up with Kaiser via email with

regard to his own excitement of the possibility of providing his patients with another modality to assist in their management of pain. *Id.* As a follow up, Dr. Stiegler requested from Kaiser materials pertinent to provider education, patient education, and delivery of the Stivax device. *Id.* Kaiser replied that he would provide informational materials, including a training manual and other research studies for review. *Id.*

61.     Thereafter, upon information and belief, Kaiser forwarded promotional material and a Subjective, Objective, Assessment and Plan ("SOAP") template for the Stivax device to Dr. Stiegler. *See* Promotional Material, attached as Exhibit 8; Stivax SOAP Template, attached as Exhibit 9.

62.     The promotional material describes the Stivax device as "Non Narcotic Pain Relief" that "Works On The Entire Body" by creating "A Surge Of [Endorphins] Throughout Your Entire Body." *See* Exhibit 8. However, the promotional material ***never*** identified the Stivax device as an electro-acupuncture device for use by qualified practitioners of acupuncture, which is not reimbursable by Medicare. In fact, in order to "qualify to try the [the Stivax device]," the promotional material advises patients, "Ask Your Physician." *Id.*

63.     As a general matter, a SOAP is a medical record maintained by a treating physician to formally document physician-patient interactions and the overall treatment plan. The SOAP template provided by Kaiser to Dr. Munderloh, Dr. Stiegler, and Munderloh Integrated Medical explicitly states:

> Procedure Performed: Analysis of neurostimulator device operation and neurostimulator device placement to the peripheral nerves. Three electrodes and one ground were ***implanted*** in the following nerve sites: auricular branches of the occipital, trigeminal, vagal and greater auricular nerves. (This

1
2

is the second of six ***weekly staged procedures***. Each procedure will be performed during the global period.)

3

*See* Exhibit 9 (emphasis added).

4
5
6
7
8

64.     However, similar to the promotional material, the SOAP template ***never*** uses the word or variation of the word "acupuncture" or mentions the reality that the Stivax is a percutaneous electro-acupuncture device for use by qualified practitioners of acupuncture, which is not implantable or reimbursable by Medicare. *See id.*

9
10
11
12
13
14

65.     Kaiser also forwarded Dr. Stiegler the Stivax Physician Promotional Video ("Promotional Video"). *See* Screenshots of Stivax Physician Promotional Video, attached as Exhibit 10. The Promotional Video, which is professionally produced and edited, displays a montage of physician interactions with patients and a voiceover that explicitly states the following:

15
16
17
18
19
20
21
22



23
24
25

"Stivax is an effective treatment option for pain conditions, both acute and chronic. Conditions, such as peripheral arterial disease, can also be positively affected." *See* Exhibit 10, A.

26
27
28

18



"Pain is the problem. Pain prevents people from the leading the lives they prefer. Using drugs to manage pain comes with risks and unwanted side effects." *See* <u>Exhibit 10</u>, B.



"That's why we developed Stivax, a safer way to manage pain. The FDA approves Stivax System [*sic*] — stimulates your nervous system with tiny impulses helping to reduce pain." *See* <u>Exhibit 10</u>, C.



"Stivax is non-habit forming and can even lessen secondary effects common with pain . . ." *See* <u>Exhibit 10</u>, D.



. . . such as insomnia and depression." *See* <u>Exhibit 10</u>, E.



"While most ***physicians*** use Stivax to help patients control numerous kinds

of pain, including chronic conditions, such as fibromyalgia and migraines . .

.” *See* Exhibit 10, F (emphasis added).



. . . the device can also be beneficial in addiction treatment.” *See* Exhibit 10,
G.



“The Stivax device is easy to use and well tolerated by the patient.” *See*

Exhibit 10, H.



"Application can be accomplished in a typical office visit. Follow up visits for device adjustment and treatment optimization are also equally efficient." *See* <u>Exhibit 10</u>, I.



"Expand your methods for managing patient pain! Learn more about Stivax as a primary or additive treatment for chronic pain and related conditions." *See* <u>Exhibit 10</u>, Screenshot J.

66.     While the Promotional Video brazenly claims that the device can treat an assortment of diseases and conditions, the Promotional Video **never** identified the Stivax device as a percutaneous electro-acupuncture device for use by qualified practitioners of acupuncture, which is not implantable or reimbursable by Medicare. *Compare* <u>Exhibit 10</u>

1   *with* Exhibit 1.

2   67.   To the contrary, the Promotional Video literally states in clear text, "***Doctors***

3   ***use Stivax to control your pain.*** *See* Exhibit 10, F.

4

5   68.   Moreover, www.stivax.us ("the Stivax Website") provided at the conclusion

6   of the Promotional Video has since been taken offline and is no longer accessible to the

7   public. *See* Exhibit 10, Screenshot J.

8

9   69.   However, at all relevant times during which the Stivax System Enterprise

10  concealed and misrepresented the Stivax device to Plaintiffs and members of the Proposed

11  Class to induce the sale of the Stivax device, the Stivax Website ***never*** advertised the Stivax

12  device as a non-reimbursable device solely intended for electro-acupuncture for use in the

13  qualified practice of acupuncture.

14

15  

16

17

18

19

20

21

22

23

24

25

26

27  *Compare*        Stivax         Website         (accessed        October        1,        2020),

28

www.stivax.us[https://web.archive.org/web/20190119093428/https://stivax.us/]attached as <u>Exhibit 11</u>, A (arrow added) *with* 2019-2020 Stivax Website (accessed October 1, 2020), www.stivax.us[https://web.archive.org/web/20200814102337/https://stivax.us/],  attached as <u>Exhibit 12</u>.



*See* <u>Exhibit 11</u>, B.



*See* <u>Exhibit 11</u>, C (arrows added).



*See* <u>Exhibit 11</u>, D (arrows added).

**E.  The Stivax Device Education and Training Meeting.**

70.     On January 27, 2017, a meeting took place between Kaiser and members of Munderloh Integrated Medical, including Dr. Munderloh, Dr. Stiegler, and Billing Specialist Erin Hansen ("Hansen"). The meeting, which lasted approximately two hours, was for purposes of training and education with regard to the use, coding, and billing of the Stivax device. Kaiser reiterated during the meeting that he had sent over, among other materials, the Promotional Video.

71.     During this meeting, Kaiser represented himself and Doc Solutions as a distributor of the Stivax device. Kaiser explained that Biegler had contacted Kaiser sometime between the end of 2015 and 2016 about the Stivax device.

72.     Kaiser indicated that in comparison to the neurostimulator devices he previously sold though his relationships with companies such as DyAnsys, the Stivax device was different. Kaiser lamented how he needed to transition from selling the previous device because, in his experience and research, the previous devices kept "slipping off," "treatment [took] too long," and the previous devices simply weren't not enough "bang for your buck."

73.     Transitioning to the Stivax device, Kaiser indicated, "[F]rom a billing standpoint, [Stivax device] is different . . . the programming code exists, that's really what I want to drive home for not only the billing but also the notes."

74.     Specifically, Kaiser instructed Dr. Stiegler and Dr. Munderloh to bill the Stivax device using a particular set of codes which yield a high reimbursement rate, including but not limited to CPT Code 95971 (Electronic analysis of an implanted

26

neurostimulator pulse generator/transmitter by physician or other qualified health care professional) and HCPCS Code L8679 (implantable neurostimulator, pulse generator).

75.     In response, Dr. Munderloh and Dr. Stiegler asked whether these codes were compliant with Medicare, in which Kaiser affirmatively responded that neither he nor his team of people had ever seen any issues related to billing, including but not limited to HCPCS Code L8679. In fact, Mark Kaiser emphasized:

> I can warn I've spoken to Medicare several times on it and they said no. They are looking at what we are doing with this Stivax device and looking at it further, um, with those codes pairing with [HCPCS Code L8679] and with **the six code** and pulling them together. But all of our Medicare representatives, which Dr. Warren has spoken to several times, say that there is no issue with using those codes together . . . that there is no issue of potential throwing red flags or causing concern or anything like that.

76.     When Dr. Munderloh, Dr. Stiegler, and Hansen expressed their uncertainty with regard to these HCPCS Codes and CPT Codes, Kaiser remarked that he felt very confident in his coding skills in an attempt to quell their concerns and lure them into purchasing the Stivax device. Kaiser added, "We have seen that the adjudications go through with it and we have faced Medicare with that before and had no issues with it, with the [CPT Code] 64553." Shortly thereafter, the following exchange occurred:

> Dr. Munderloh: The thing that made me paranoid is that Medicare is going to say "you're billing it wrong" and they are going to come back and recoup money, or ask for money back . . . and I'm like, I just want to make sure that the compliance work is done and Dr. Stiegler, you know, has been diligent the past couple weeks, talking to you, you called *Biegler*, researching codes. We just want to make sure that we are doing everything compliant.
>
> Kaiser: Oh, absolutely.
>
> Dr. Munderloh: [Dr. Warren's] got the credentials of a compliance officer. Do you check this with other compliance officers in addition and they all come to the same conclusion that this is compliant via Medicare and this is the reason why?

27

Kaiser: Yes and let me explain it further. Yes, I have, Dr. Warren has always been my go-to simply because to be blunt with you, he and I work well with each other, we get along.

. . .

Dr. Munderloh: We just wanna make sure that Medicare, we're compliant and we have, you know, if they audit our records and they audit the Stivax designation code that that's the right code for that device and if that's it then we're fine. That's all we want to know.

Kaiser: Sure. I appreciate you guys asking all these questions and that's why I'm here.

77.     On the topic of functionality, Kaiser indicated that the Stivax is different from other neurostimulators in that the Stivax device was an implantable pain management medical device and explained, "[T]his is a little different because we're piercing skin. We're doing a lot of things. We're doing electrical devices and stuff like that."

78.     On topic of purchasing, Dr. Munderloh highlighted that the FDA categorized the Stivax as an electro-acupuncture stimulator, and then asked Kaiser whether an acupuncturist could simply purchase and administer the Stivax device.

79.     Kaiser replied that neither an acupuncturist nor chiropractor could purchase a Stivax device unless there was a medical provider on staff. Kaiser claimed that if an acupuncturist or chiropractor sought to purchase a Stivax from him:

> [W]e stonewall them right out of the shoot and if it's not . . . people that I know that have medical providers, then we stone wall them right out of the shoot and ask them their NPI. Because that's perfectly fine for us to do. We'll ask them what their NPI is and we'll be able to find out real fast if they have another provider that they're working with because **_we are not in the business of selling this to people who can't legally use it_**.

80.     During the January 2017 meeting, Dr. Munderloh and Dr. Stiegler prioritized ethics and compliance with the law, particularly with regard to billing for their services

performed at Munderloh Integrated Medical. However, despite their earnest and wholehearted efforts to learn about the proper use, coding, and billing for the Stivax device from Kaiser during the meeting, Kaiser accomplished his part in the Stivax Coding Scheme by fraudulently misrepresenting and concealing critical information pertinent to the Stivax device.

**F. The Purchase of the Stivax Device and Subsequent Reimbursement Issues.**

81.     Upon information and belief, as a result of Kaiser's fraudulent misrepresentations and concealment in conjunction with the use of the promotional material and Promotional Video funded and developed by Solace Advancement and Biegler, Plaintiffs purchased hundreds of Stivax devices from the Stivax System Enterprise, whereby Biegler manufactured the device; Solace Advancement imported and contracted with Doc Solutions to distribute the Stivax device to medical providers; Doc Solutions fulfilled orders submitted by medical providers; and Kaiser continued to mispresent the Stivax device through so-called presentations, training, education, and instructions.

82.     The Stivax devices were shipped to Plaintiffs by Doc Solutions and/or Solace Advancement in individual boxes labeled with the Stivax logo and Biegler's company name and address on the back. *See* Stivax Device and Packaging, attached as Exhibit 13.



*See* <u>Exhibit 13</u>, A.



*See* <u>Exhibit 13</u>, B (emphasis added).

83.     The unique identification device ("UDI") sticker also includes the same

Stivax logo and Biegler's company name and address:



*See* Exhibit 13, C (emphasis added).

84.     Dr. Munderloh and Dr. Stiegler on behalf of Munderloh Integrated Medical completed and submitted order forms to Defendant Doc Solutions, as did hundreds of medical providers across the country. *See* Stivax Order Form, attached as Exhibit 14; Stivax Order Form—Credit/Debit Cards, attached as Exhibit 15; Stivax Order Form—Shipping and Payment Terms, attached as Exhibit 16.

85.     However, the Stivax System Enterprise's fraudulent misrepresentations and concealment resulted in tens of thousands of overpayments from Medicare for claims pursuant to the Stivax device as the result of improper use, coding, and billing.

86.     Pursuant to these overpayments and imminent audits, medical providers across the country alerted Kaiser, who then scheduled a teleconference for December 15, 2017. Ahead of this conference call, Kaiser sent Plaintiffs and members of the Proposed Class an email with an attached "updated" coding instructions for the Stivax device. *See* December 14, 2017 Updated Stivax Coding Instructions, attached as Exhibit 17. Yet again,

the Stivax System Enterprise instructed Plaintiffs in writing to use inappropriate billing codes, including but not limited to HCPCS Code L8679, even after receiving complaints and notice that HCPCS Code L8679 and other codes given were improper for coding and billing the Stivax device.

87.     On December 15, 2017, the scheduled teleconference call took place. The conference call, conducted by Kaiser, included several dozen medical offices across the United States. The purpose of the call was to address concerns from providers, billing departments, compliance officers, and other members of medical offices regarding the misinformation, coding advice, and billing issues with the Stivax device communicated and caused by the Stivax Coding Scheme.

88.     One caller had expressed her concern to Kaiser and revealed that their office medical billing department had received an alert that Medicare was set to launch nationwide audits into medical offices that administer Stivax devices, which were all purchased from the Stivax System Enterprise. In an attempt to downplay this concern, Kaiser responded that he had been involved with three devices—presumably referring to the Stivax device's predicate devices—and their launches during the course of his career, whereby medical offices "get simply jammed up" because the providers are not "completing notes" or using improper "identification codes"; an attempt to shift the blame for overpayments and denials onto the medical providers.

89.     In the face concern and aware of these critical issues that carry significant consequences, Kaiser was relentless in his commitment to the Stivax Coding Scheme by insisting (1) the Stivax device was reimbursable by Medicare; (2) HCPCS Code L8679 was

the correct code to submit to Medicare for reimbursement of the Stivax device; and (3) Plaintiffs must use HCPCS Code L8679 to bill Medicare correctly. *See* Exhibit 17.

90.    Thereafter, on July 17, 2018, Plaintiffs received a letter from Qlarant Integrity Solutions, LLC ("Qlarant"), a Unified Program Integrity Contractor ("UPIC"). *See* UPIC Qlarant Actual Findings, dated July 17, 2018, attached as Exhibit 18. Qlarant is responsible for detecting, preventing, and proactively deterring fraud, waste, and abuse in Medicare and Medicaid Programs. Qlarant performs analyses and/or reviews to determine whether the services billed by providers and paid by Medicare to providers/supplier are reasonable and necessary.

91.    The UPIC Qlarant's Actual Findings described the methodology for its calculation of the actual overpayment amount and indicated that it had examined the universe of Medicare Part B payments made to Plaintiffs to determine if the payments were appropriate for the services rendered. Qlarant indicated that the claims selected were all paid claims processed with HCPCS Code L8679 or CPT Code 95971 between the period of October 1, 2016 and July 6, 2018. In total, the entire universe of effected claims numbered 103 claims for which Munderloh Integrated Medical was paid a total of $420,227.30 through May 14, 2018. *Id*. This amount was determined by denying all Stivax device services because they are not covered by Medicare, yielding an overpayment of $420,227.30.

92.    On September 4, 2018, Qlarant sent Dr. Munderloh a letter to inform him of the results of their review of all claims billing HCPCS Code L8679, which Qlarant verified through an interview with Dr. Stiegler. *See* UPIC Qlarant HCPCS Code L8679 Findings,

dated as September 4, 2018, attached as <u>Exhibit 19</u>. Explicitly, Qlarant stated:

> We have determined that Munderloh Medical LLC rendered Stivax and billed the service as L8679, which constitutes a ***misrepresentation*** of the service. Stivax is a percutaneous electrical nerve stimulator (PENS) developed by ***Biegler*** and designed to administer auricular neurostimulation treatment over several days for treatment of pre-operative, intra-operative and chronic pain….***[I]t is inappropriate for a patient to visit a physician, physical therapist or an outpatient clinic on an ongoing basis for treatment of pain with electrical nerve stimulation.*** Electrical nerve stimulation treatments furnished by a physician in the office, by a physical therapist or outpatient clinic are excluded from coverage by § 1862(a)(1)(A).

*Id.* (emphasis added).

93.    Qlarant further explained that "[a] device implanted in the body is under the skin. A device percutaneously inserted is on top of the skin and electrodes/wires are inserted through the skin." *Id.* Qlarant emphatically asserted that, as a result, "Billing L8679 would ***not*** be the correct coding for [the Stivax as it] does ***not*** match the description of the L8679 code – implantable neurostimulator, pulse generator, any type." *Id.* (emphasis added).

94.    Qlarant found that (1) HCPCS Code L8679 was not the correct coding for the Stivax device because it does not match the description of HCPCS Code L8679; (2) CPT codes 64553-64561 for percutaneous implantation of neurostimulator electrodes were also inappropriate since PENS use percutaneously inserted needles and wires rather than percutaneously implanted electrodes; and, finally, (3) CPT code 64590 was also inappropriate since stimulation devices used for PENS codes are not implanted. Qlarant concluded, "Medicare reimbursement for acupuncture, as an anesthetic or as an analgesic or for other therapeutic purposes, may not be made. Accordingly, acupuncture is not considered reasonable and necessary," hence there are no specific or appropriate HCPCS

Code or CPT codes for PENS such as the Stivax device. *Id.*

95.     On September 25, 2018, there was a teleconference call between Dr. Munderloh, Dr. Stiegler, and Hansen of Munderloh Integrated Medical; and Dr. Warren of Titan Medical Compliance to discuss UPIC Qlarant's findings. During the call, Dr. Warren admitted that similar recoupment issues occurred with other medical practices.

96.     The parties discussed the FDA's classification of the Stivax device. Dr. Warren claimed, "when the Stivax came out, the FDA put it into a classification where it is an implanted device." Dr. Warren also claimed that he had "some success" with other medical practices in the appeals process for reimbursement of the Stivax device. Dr. Warren further claimed, "there's some specific verbiage we have to use in order to be able to submit the appeal." Hansen expressed to Dr. Warren that she recalled precisely following Dr. Warren's previous instructions to use HCPCS Code L8679 to bill Medicare, which lead to the overpayment predicament. In response, Dr. Warren contested that the issue was not necessarily an issue with the Stivax device as an implantable device or the codes used to bill the Stivax device, but rather a "necessity issue"; yet another attempt by the Stivax System Enterprise to shift the blame of the audits and overpayments onto the medical providers and obscure the Stivax Coding Scheme.

97.     Dr. Munderloh responded that the letter he had received from Qlarant "doesn't say anything about being medically necessary." Rather, as Dr. Munderloh carefully explained to Dr Warren, Qlarant's position in the letter was quite clear that the issue was that the Stivax device did not meet HCPCS Code L8679, contrary to Kaiser and Dr. Warren's previous instructions and training. In response, Dr. Warren confirmed that he

did in fact instruct and train Dr. Munderloh, Dr. Stiegler, and Hansen to use HCPCS Code L8679 to submit claims to Medicare for reimbursement of services pursuant to the Stivax device. However, once again, Dr. Warren claimed that the Stivax device "does meet the standard of [HCPCS Code L8679]."

98.     During this conversation, not only did Dr. Warren further misrepresent the Stivax device as an implantable device that meets the definition of HCPCS Code L8679, but Dr. Warren also insisted that Medicare's denial was rooted in insufficient medical documentation of a medical necessity and suggested submitting an abundance of medical documentation for each appeal in hopes that Medicare would simply overturn its decision.

99.     Dr. Warren then requested that Plaintiffs forward him all of Qlarant's letters and findings after they had signed a service agreement and business associate agreement with Titan Medical Compliance. *See* Titan Medical Compliance Service Agreement, dated September 25, 2018, attached as Exhibit 20; Titan Medical Compliance Business Associate Agreement, dated September 25, 2018, attached as Exhibit 21.

100.     Unbeknownst to Plaintiffs but at all times known by Defendants, the Stivax device (1) does ***not*** meet HCPCS Code L8679 or any CPT codes provided by Defendants, and (2) the Stivax device is ***not*** reimbursable by Medicare. Plaintiffs coded and billed the Stivax device as per Kaiser's and Dr. Warren's training and instructions, who were directly or indirectly funded, instructed, and/or influenced by Solace Advancement and Biegler.

101.     The intentionality of the Stivax Coding Scheme perpetrated by the Stivax System Enterprise is exemplified by the very fact that even after being informed that the billing and coding instructions they had given Plaintiffs were incorrect, Defendants

persisted in their fraudulent concealment and misrepresentations that their coding, billing and reimbursement instructions were proper, appropriate, and compliant with Medicare.

102.    The Defendants did so because the high reimbursement under the codes promoted by them encouraged medical providers such Dr. Munderloh, Dr. Stiegler, Munderloh Integrated Medical, and members of the Proposed Class to purchase the Stivax devices at an excessively high price from the Defendants. Plaintiffs and members of the Proposed Class then reasonably relied on the purported expertise of the Defendants with respect to the Stivax device and its billing, coding, and reimbursement.

## RICO ALLEGATIONS

### A. The Stivax System Enterprise

103.    Plaintiffs hereby replead and incorporate by reference each and every allegation set forth above, and further states as follows:

104.    Defendants and the individuals named herein are "persons" within the meaning of 18 U.S.C. § 1961(3).

105.    Based upon Plaintiffs' current knowledge, the following persons constitute a union or group of individuals associated in fact that Plaintiffs hereinafter refer to as the "Stivax System Enterprise."

        a.  Biegler;

        b.  Solace Advancement;

        c.  Doc Solutions;

        d.  Kaiser;

        e.  O'Neill;

f.   Titan Medical Compliance;

g.   Dr. Warren;

h.   ABC Corps. 1-50; and

i.   John Does 1-50.

106.   The common purpose of the Stivax System Enterprise is to sell the Stivax device to medical providers because the high reimbursement under the codes promoted by them encouraged medical providers like Dr. Munderloh, Dr. Stiegler, Munderloh Integrated Medical, and members of the Proposed Class to purchase the Stivax devices at an excessively high price.

107.   During the meeting that took place on January 27, 2017, Kaiser explicitly described the structure of the Stivax System Enterprise:

> [T]he way Biegler and the company that I represent…ok, so basically, how this whole thing shakes down is you have the importer and then you have me and my company. So what we do, what my company does and all my sales reps are is we do these meetings all day long. And so we handle the distribution throughout North America.

108.   Upon information and belief, as illustrated in the Promotional Video and the Stivax Website and confirmed by Kaiser himself, the structure and organization of the Stivax System Enterprise is explicitly confirmed branching top-down as follows: Biegler developed and manufactured the Stivax device; Solace Advancement served as the US importer and primary US distributor of the Stivax device; Doc Solutions and ABC Corps. 1-50 distributed the Stivax device in various regions throughout the United States; Kaiser and John Does 1-50 made presentations to Plaintiffs and induced the sale of the Stivax device; and Dr. Warren and John Does 1-50 provided further false coding and billing

information on behalf of the Stivax Coding Scheme. *See* Exhibit 10; Exhibit 11.

109. Alternatively stated, upon information and belief, the hierarchy of the Stivax System Enterprise from the ground-floor up in a pyramid begins with the Stivax System Enterprise's Sales Agents and Coding Agents who were directly or indirectly instructed, funded, and guided by Solace Advancement and/or Biegler. These Sales Agents (Doc Solutions, Kaiser, ABC. Corps., and John Does 1-50) introduced medical providers—such as Dr. Munderloh, Dr. Stiegler, and Munderloh Integrated Medical—to the Stivax device and proceeded to fraudulently conceal and misrepresent the Stivax device through various modes of communications, including but not limited to emails, electronic media, teleconferences, in-person presentations, and purported device administration and billing training sessions.

110. Upon information and belief, these Sales Agents' misrepresentations and concealment of the Stivax device were reinforced side-by-side with Coding Agents (Titan Medical Compliance, Dr. Warren, ABC Corps., and John Does 1-50), who further misrepresented and concealed the true nature of the Stivax device under the guise of compliance officers and billing experts. The Sales Agents and Coding Agents were directly and/or indirectly carrying out the Stivax Coding Scheme through the coordination, funding, direction, and materials provided by Solace Advancement and/or Biegler, including but not limited to the promotional material, SOAP template, and the Promotional Video. *See* Exhibits 8; Exhibit 9; Exhibit 10.

111. Upon information and belief, the collective purpose of the promotional material, SOAP template, Promotional Video, and Stivax Website was to misconstrue and

conceal the true and accurate description of the Stivax device as an electro-acupuncture device for use in the practice of acupuncture by qualified practitioners of acupuncture; to misrepresent the Stivax device as a non-narcotic implantable pain management medical device to be administered only by physicians and licensed healthcare providers; to advertise the device as reimbursable by Medicare; and to fraudulently induce the sale of the Stivax device by medical providers.

112.    Upon information and belief, the Promotional Video was produced, funded, and provided by Solace Advancement and/or Biegler. *See* Exhibit 10. The content of the Promotional Video contains the ***same*** misinformation, misrepresentations, and concealments as Kaiser's presentations/training sessions and Dr. Warren's instructions. The Promotional Video concludes with a link to the Stivax Website with "all rights reserved" to Solace Advancement. *See* Exhibit 10, J; Exhibit 11, A.

113.    In essence, the Stivax Website—owned and controlled by Solace Advancement or its agents—lured prospective purchasing medical providers to visit the Stivax Website. *See id.* It is imperative to note that the Stivax Website reiterates the ***same*** misinformation, misrepresentations, and concealments as the Promotional Video's content, Kaiser's presentations/training, and Dr. Warren's instructions.

*114.*    In fact, Kaiser's training sessions are unequivocally referenced on the Stivax Website—which is operated by Solace Advancement at the direction and/or funding provided by Biegler. *See* Exhibit 11, D. Similarly, the Stivax Website's online enrollment and purchasing form requiring a prospective purchaser to verify whether he or she is a doctor of medicine or doctor of osteopathy unsurprisingly conforms with not only the

Promotional Video provided to Plaintiffs and members of the Proposed Class by Kaiser but also Kaiser's misrepresentation that only a medical provider could purchase the Stivax device. *See id.*

115.    Upon information and belief, Biegler directed Solace Advancement to include a hyperlink on the Stivax Website, which leads to Biegler's own website that contains the *same* misinformation, concealment, and misrepresentations about the Stivax device as the Stivax Website, the Promotional Video, Kaiser's misrepresentation, and Dr. Warren's instructions. *See* Exhibit 11, Screenshot C.

116.    The 2019-2020 Stivax Website was rewritten to include language about acupuncture and changed hands only *after* the Stivax System Enterprise had already victimized and defrauded hundreds of medical providers, such as Plaintiffs and members of the Proposed Class. *Compare* Exhibit 12 *with* Exhibit 11. To this end, such changes to the 2019-2020 Stivax Website—which nevertheless continued to misrepresent the Stivax device—combined with CMS's November 2014 final decision and the October 2015 Joint DME MAC Publication evidences not only Defendants' actual knowledge that the Stivax device was an electro-acupuncture device solely for use in the practice of acupuncture by qualified practitioners of acupuncture but also their intent to defraud medical providers and Medicare.

117.    Precisely, Defendants profited from the sale of each Stivax device its Sales Agents sold. Specifically, the Stivax System Enterprise's Sales Agents profited from the spread between the wholesale price it paid to Solace Advancement for each Stivax device and the retail price it ultimately charged medical providers for each device.

118.   The relationships by and among the members of the Stivax System Enterprise are well-defined:

a.  Biegler is the manufacturer of the Stivax device.

b.  Biegler sought and received clearance from the FDA to market the Stivax device as an electro-acupuncture device for use in the practice of acupuncture by qualified practitioners of acupuncture based on its representation that the Stivax was substantially equivalent to the P-Stim device.

c.  Biegler in conjunction with other members of the Stivax System Enterprise developed the Stivax Coding Scheme, fashioned from fraudulent billing and coding protocols it previously deployed in marketing the P-Stim device.

d.  Biegler, with actual notice that electroacupuncture devices for use in the practice of acupuncture by qualified practitioners of acupuncture are not reimbursable by Medicare, in conjunction with other members of the Stivax System Enterprise, concocted the Stivax Coding Scheme to manipulate and defraud Plaintiffs by concealing and misrepresenting the Stivax device.

e.  Biegler and Solace Advancement collaborated, created, and disseminated marketing and sales material to the Sales Agents of the Stivax System Enterprise, including the precise documents provided to the Plaintiffs as alleged herein, and controlled all messaging associated with marketing and selling the devices including, most notably, that no mention was to be made that the Stivax device was in fact FDA-cleared as merely an electro-acupuncture device.

f.  Doc Solutions, Kaiser, ABC Corps. 1-50, and John Does 1-50 served as Sales Agents of the Stivax System Enterprise and were in "exclusive" distributionships engaged by Solace Advancement and Biegler to market and sell the Stivax device in defined geographic areas using the Stivax device sales/promotional material.

g.  Kaiser, Chief Executive Officer and one of the true owners of Doc Solutions, was one among many personally tasked with marketing and selling the Stivax device in using the Stivax device sales materials or modified versions thereof.

h.  Dr. Warren, Titan Medical Compliance, and John Does 1-50 were retained and paid directly by the Stivax System Enterprise to support its

42

Sales Agents by lending their name and the credentials of their owners, including Dr. Warren, to the coding sequences and protocols comprising the Stivax Coding Scheme.

119.    The Stivax System Enterprise maintained its existence from *at least* May 2016 (when the Stivax device first received FDA-clearance) through *at least* February 2019 (the month through which the Stivax Website continued to mispresent and sell the Stivax device). *See* Exhibit 1; Exhibit 11.

120.    Upon information and belief, the Stivax System Enterprise has continued for some time since February 2019 as the Stivax System Enterprise continued to market the Stivax device through *at least* October 2020. *See* October 2020 Stivax Website (accessed November                    30,                    2020), www.stivax.us[*https://web.archive.org/web/20201001033758/https://stivax.us/*], attached as Exhibit 22. In all, the Stivax System Enterprise either continues to maintain its existence or at the very least maintained its existence long enough to permit these associates to accomplish the Stivax System Enterprise's purpose.

121.    While Defendants participate in, are members of, and are part of the Stivax System Enterprise, they also have an existence separate and distinct from this association-in-fact enterprise.

122.    Each member of the Stivax System Enterprise performed different roles within the enterprise. The separate legal incorporations of the Sales Agents and the Coding Agents were used to facilitate the Stivax System Enterprise's pattern of racketeering activity. Specifically, the Sales Agents and Coding Agents and their relationships with Biegler were intended to insulate Biegler from the Stivax Coding Scheme while Biegler

continued to manufacture and supply the Stivax device to support the enterprise.

123.    The Stivax System Enterprise is an ongoing organization that engages in, and whose activities affect, interstate commerce. Specifically, the purpose of the Stivax System Enterprise was and is to induce medical device sales to medical providers with offices throughout the United States, including in the state of Arizona.

**B.  The Pattern of Racketeering Activity**

124.    Plaintiffs hereby replead and incorporate by reference each allegation set forth above, and further states as follows:

125.    18 U.S.C. §1961(1) provides that a "racketeering activity" includes any act indictable under 18 U.S.C. § 1341 (relating to mail fraud) and 18 U.S.C. § 1343 (relating to wire fraud). As set forth below, Defendants have and continue to engage in conduct violating these laws to effectuate their illegal scheme.

126.    For the purpose of executing and/or attempting to execute the above described scheme to defraud or obtain money by means of false pretenses, representations or promises, the Defendants, in violation of 18 U.S.C. § 1341, placed in post offices and/or in authorized repositories matter and things to be sent or delivered by the Postal Service or commercial interstate carrier, and received matter and things from the Postal Service or commercial interstate carriers, including but not limited to those transactions and communications as to Plaintiffs. Further, these matter and things were then received by Plaintiffs in Flagstaff, AZ. *See* Exhibit 14, Exhibit 15, and Exhibit 16.

127.    For the purpose of executing and/or attempting to execute the above-described scheme to defraud or obtain money by means of false pretenses, representations

or promises, the Defendants, also in violation of 18 U.S.C. § 1343, transmitted and received by wire and through other interstate electronic media, matter and things, including but not limited to, those same transactions and communications. *Id.*

128.   Other matter and things sent through or received from the Postal Service, commercial carrier, or interstate wire transmission by Defendants included information or communications in furtherance of or necessary to effectuate the fraudulent scheme. *See, e.g.,* Exhibit 16.

129.   Defendants' misrepresentations, acts of concealment, and failures to disclose were made for the purpose of deceiving Plaintiffs and obtaining their property for the Defendants' gain based on the purported high reimbursement under the billing codes promoted by them specifically to encourage healthcare providers such as Plaintiffs and members of the Proposed Class to purchase the Stivax devices at an excessively high price.

130.   Defendants either knew or recklessly disregarded the fact that the misrepresentations and omissions described above were material.

131.   As a result, Defendants obtained money and property belonging to Plaintiffs and members of the Proposed Class, who subsequently suffered substantial harm with regard to their business or property by Defendants' overt acts of mail and wire fraud.

132.   Defendants engaged in a "pattern of racketeering activity," as defined by 18 U.S.C. § 1961(5), by committing or aiding and abetting in the commission of at least two acts of racketeering activity, that is, indictable violations of 18 U.S.C. §§ 1341 and 1343 as described above, within the past ten years. In fact, the Defendants have committed numerous acts of racketeering activity. Each act of racketeering activity was related, had a

similar purpose, involved the same or similar participants and method of commission, had similar results, and impacted similar victims, including Plaintiffs and members of the Proposed Class.

133.    The multiple acts of racketeering activity that Defendants committed were related to each other and amount to and pose a threat of future repetition and continued racketeering activity, and therefore constitute a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5).

## CLASS ALLEGATIONS

134.    Plaintiffs hereby replead and incorporate by reference each and every allegation set forth above, and further states as follows:

135.    Plaintiffs bring this class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, individually and on behalf of all members of the following Proposed Class. The Proposed Class consists of:

> All medical providers located within the United States who purchased one or more Stivax devices from the Defendants from within the longest period allowed by statute before filing of this action up through and including the date of judgment in this case. Excluded from this class are any medical providers, if any, who have previously settled or compromised claims(s) as identified herein for the class.

136.    The members of the Proposed Class are so numerous that joinder of all members is impracticable. While the precise number of members of the Proposed Class is known only to the Defendants, the number of medical providers who purchased one or more Stivax devices from the Defendants from within the longest period of time allowed by statute before the filing of this action is certainly in excess of 100 persons.

137.   Common questions of law and fact that can be resolved with common answers exist as to all class members. Such common questions include whether:

   a.   The Stivax System Enterprise is as association-in-fact;

   b.   The acts of the Stivax System Enterprise affected interstate commerce;

   c.   Defendants either directly or indirectly invested in, maintained an interest in, or participated in the conduct of the Stivax System Enterprise;

   d.   Defendants were involved in a pattern of racketeering;

   e.   Defendants were involved in a scheme to defraud in violation of the mail and wire fraud statutes which constituted racketeering activity in furtherance of a scheme;

   f.   Defendants' racketeering acts were conducted as part of a pattern;

   g.   Defendants' racketeering acts were in furtherance of the Stivax Coding Scheme;

   h.   Defendants deliberately or negligently made misrepresentations concerning the nature, purpose, and functionality of the Stivax device;

   i.   Defendants deliberately made misrepresentations concerning the correct billing, coding, and reimbursement for the Stivax device;

   j.   Defendants had reason to expect that the substance of these misrepresentations would be communicated and repeated to Plaintiffs and other medical providers through sales and marketing representatives;

   k.   Defendants had reason to expect that the substance of these misrepresentations would induce Plaintiffs and other medical providers and facilities to rely upon the misrepresentations and upon which Plaintiffs and other medical providers did, indeed, justifiably rely to their detriment;

   l.   Whether Plaintiffs and other medical providers did, indeed, justifiably rely to their detriment on Defendants misrepresentations;

   m.   Proposed Class members are entitled to recover compensatory damages, including but not limited to all amounts paid to Defendants

for the Stivax devices they purchased under false pretenses;

n.   Proposed Class members are entitled to recover interest on such compensatory damages, including but not limited to interest on all amounts paid to Defendants for the Stivax devices they purchased under false pretenses;

o.   Proposed Class members are entitled to punitive damages based on Defendants' acts or omissions, because such acts or omissions were actuated by actual malice or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions; and

p.   Proposed Class members are entitled to other equitable relief as sought herein.

138.   Plaintiffs' claims are typical of the claims of the Proposed Class.

139.   Plaintiffs will fairly and adequately protect the interests of the Proposed Class. Plaintiffs' interests do not conflict with the interests of the Proposed Class members. Furthermore, Plaintiffs have retained competent counsel experienced in class action litigation. Plaintiffs' counsel will fairly and adequately protect and represent the interests of the Proposed Class.

140.   The prosecution of separate actions by individual members of the Proposed Class would create a risk of inconsistent or varying adjudications which could establish incompatible standards of conduct for Defendant.

141.   By routinely misrepresenting the correct billing, coding, and reimbursement for the Stivax device, Defendants have acted or refused to act on grounds that apply generally to the Proposed Class.

142.   Common questions of law or fact common to the class members predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy because

joinder of all members of the Proposed Class is impracticable.

143.    Defendants maintain sales records of who purchased the Stivax devices, in what amounts, and for how much, thus the members of the Proposed Class can be readily and objectively ascertained through the use of records maintained by Defendants.

## IV.    CLAIMS FOR RELIEF

### COUNT ONE
### CIVIL VIOLATION OF RICO – 18 U.S.C. § 1962(c)
### (Against all Defendants)

144.    Plaintiffs, individually and on behalf of all others similarly situated, repeat, reallege, and incorporate by reference each of the foregoing and subsequent allegations of this Complaint as if fully set forth herein.

145.    This claim for relief arises under 18 U.S.C. § 1962(c).

146.    Each Plaintiff and each Proposed Class member is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

147.    Each Defendant and associate of the Stivax System Enterprise is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 18 U.S.C. 1962(c).

148.    Through agreements between the Defendants and joint management activity between the conspirators, the Defendants formed an association-in-fact, referred to herein as the Stivax System Enterprise, which constitutes an "enterprise" engaged in illegal activities affecting interstate commerce pursuant to 18 U.S.C. §§ 1961(4) and 1962(c).

149.    The purpose of the Stivax System Enterprise was to enhance Defendants' profits by misrepresenting and concealing the true nature of the Stivax device, whereby the Defendants' defrauded Plaintiffs and members of the Proposed Class. At all relevant times,

Defendants were associated with the Stivax System Enterprise through their joint ownership, employment, and/or business relationship with the Stivax System Enterprise, and its fraudulent and misrepresentative statements about the Stivax and reimbursement for the Stivax device and services rendered.

150.    The Defendants were also associated with the Stivax System Enterprise through their participation in its management and operation by directing is affairs and assisting the fraudulent billing scheme. The Defendants participated, directly and indirectly, in the conduct of the enterprise's affairs through a pattern of unlawful activity under 18 U.S.C §§ 1961(1)(b), 1961(5), and 1962(c), as follows:

> a.   Multiple acts of mail fraud, in violation of 18 U.S.C. § 1341, detailed herein;
>
> b.   Multiple acts of wire fraud, in violation of 18 U.S.C. § 1943, detailed herein; and
>
> c.   Multiple instances of interstate transport of money converted or fraudulent obtained, in violation of 18 U.S.C. § 2314, detailed herein.

151.    Each Proposed Class member suffered injury to his or her property, within the meaning of 18 U.S.C. § 1964(c), by reason of the violation of 18 U.S.C. § 1962(c). Plaintiffs and members of the Proposed Class were injured by reason of Defendants' RICO violations, described herein. The injuries of the individual Plaintiffs' and the members of the Proposed Class were proximately caused by Defendants' violations of 18 U.S.C. § 1962(c) because these injuries were the foreseeable, direct, intended, and natural consequence of Defendants' RICO violations (and commission of underlying predicate

acts) and, but for Defendants' RICO violations (and commission of underlying predicate acts), they would not have suffered these injuries.

152.   Pursuant to Section 1964(c) of RICO, 18 U.S.C. § 1964(c), Plaintiffs and the members of the Proposed Class are entitled to recover threefold their damages, costs and attorneys' fees from Defendants and other appropriate relief.

**COUNT TWO**
**CONSPIRACY TO COMMIT**
**CIVIL VIOLATION OF RICO – 18 U.S.C. § 1962(d)**
**(Against all Defendants)**

153.   Plaintiffs, individually and on behalf of all others similarly situated, repeat, reallege, and incorporate by reference each of the foregoing and subsequent allegations of this Complaint as if fully set forth herein.

154.   This claim for relief arises under 18 U.S.C. § 1962(d).

155.   Each Plaintiff and each Proposed Class member is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

156.   Each Defendant and associate of the Stivax System Enterprise is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 18 U.S.C. 1962(d).

157.   Defendants conspired to conduct or participate, directly or indirectly, in the conduct of the affairs of the Stivax System Enterprise, through a pattern of racketeering activity. The conspiracy to violate § 1962(c) constitutes a violation of § 1962(d).

158.   In furtherance of the conspiracy to violate § 1962(c), Defendants agreed to commit numerous predicate acts of "racketeering activity," as defined in 18 U.S.C. § 1961(5), prior to and during the RICO Class Period, and they continue to commit such predicate acts, in furtherance of the recoupment scheme, including (a) mail fraud, in

violation of 18 U.S.C. § 1341, and (b) wire fraud, in violation of 18 U.S.C. § 1343.

159.   As a direct and proximate result of the conspiracy to violate § 1962(c), Plaintiffs and the Proposed Class members have each been injured in their business and property within the meaning of 18 U.S.C. § 1964(c), and are entitled to recover treble damages together with the costs of this lawsuit, expenses, and reasonable attorneys' fees.

**COUNT THREE**
**FRAUDULENT MISREPRESENTATION**
**(Against all Defendants)**

160.   Plaintiffs, individually and on behalf of all others similarly situated, repeat, reallege, and incorporate by reference each of the foregoing and subsequent allegations of this Complaint as if fully set forth herein.

161.   Defendants made material misrepresentations to Plaintiffs and members of the Proposed Class by means of oral representations, labeling, advertisements, promotions/or marketing, that the Stivax device could be billed to third party payors and Medicare insurers with a particular resulting reimbursement, as alleged more fully herein above. Although the Defendants may have included disclaimers or caveats with their misrepresentations, those disclaimers or caveats were ambiguous and, in the context of the balance of the communications by the Defendants, misleading. Moreover, the Defendants conduct was overwhelmingly inconsistent with the disclaimers and caveats, rendering the latter ineffective. The general disclaimers made by the Defendants were contradicted by their specific representations that the billing advice they gave in connection with their marketing was correct.

162.   Defendants' representations were untrue, or at the least, made with reckless

disregard for its truth.

163.   Defendants made the representations herein alleged with the intention of inducing Plaintiffs and members of the Proposed Class to purchase Stivax devices from Defendants.

164.   At the time Defendants made the representations herein alleged, Defendants knew that the representations were false.

165.   Plaintiffs and members of the Proposed Class justifiably relied upon Defendants' fraudulent and intentional misrepresentations and, in reliance on those representations, were induced to purchase Stivax devices from Defendants.

166.   As a direct and proximate result of Defendants' intentional misrepresentations, Plaintiffs and members of the Proposed Class were harmed in an amount to be determined at trial.

**COUNT FOUR**
**INTENTIONAL MISREPRESENTATION BY CONCEALMENT**
**OR NON-DISCLOSURE**
**(Against all Defendants)**

167.   Plaintiffs, individually and on behalf of all others similarly situated, repeat, reallege, and incorporate by reference each of the foregoing and subsequent allegations of this Complaint as if fully set forth herein.

168.   Defendants failed to disclose material facts regarding the reimbursement, billing and collections rules and characteristics in connection with the Stivax devices purchased by Plaintiffs and members of the Proposed Class, and the exposure the Plaintiffs and members of the Proposed Class would have to Medicare and third-party payors if they followed Defendants' billing advice.

169.    Defendants had to a duty to disclose, failed to disclose, and purposefully failed to disclose accurate facts about the billing and collections rules and characteristics about the Stivax services.

170.    Specifically, the Defendants intended to deceive the Plaintiffs and members of the Proposed Class of the fact that the Stivax did not have the attribute of being billable and reimbursable in the way asserted by the Defendants, and knew that the Plaintiffs and members of the Proposed Class would have not purchased the Stivax devices or Stivax services, or would have paid a lower price for the Stivax or Stivax services had Plaintiffs and members of the Proposed Class knew of the undisclosed material facts.

171.    This failure to disclose induced the Plaintiffs and members of the Proposed Class to act.

172.    As a direct and proximate result of Defendants' concealment of material facts, Plaintiffs and members of the Proposed Class were damaged in a way to be determined at trial.

## COUNT FIVE
## CIVIL CONSPIRACY
### (Against all Defendants)

173.    Plaintiffs, individually and on behalf of all others similarly situated, repeat, reallege, and incorporate by reference each of the foregoing and subsequent allegations of this Complaint as if fully set forth herein.

174.    All Defendants consist of two or more persons.

175.    All Defendants did agree or had an understanding to effectuate the intentional misrepresentations, concealment of material facts, and/or the conduct alleged in the

foregoing paragraphs.

176.    The agreement by all Defendants was designed to pursue an unlawful purpose.

177.    As a direct and proximate result of Defendants' agreement to pursue an unlawful purpose, Plaintiffs and members of the Proposed Class suffered and continue to suffer special damages.

## V.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand relief in their favor and against the Defendants as follows:

1.    That the Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, that the Plaintiffs are proper class representatives, and that their counsel is adequate class counsel;

2.    That the Court certify the Proposed Class identified above;

3.    That judgment be entered against Defendants and in favor of Plaintiffs and the Proposed Class on the Causes of Action in this Class Action Complaint, for actual, compensatory, and punitive damages, in an amount to be determined at trial;

4.    That, pursuant to RICO, the Plaintiffs and the Proposed Class be awarded an amount three times the amount of any and all damages suffered as a result of the illegal acts set forth herein, as well as any and all other amounts or damages allowed to be recovered under RICO;

5.    That the Court award the Plaintiffs and the Proposed Class attorneys' fees and litigation costs against Defendants;

6.     That judgment be entered imposing pre-judgment interest on damages, attorneys' fees, and litigation costs against Defendants; and

7.     That the Court award against Defendants and for Plaintiffs and the Proposed Class all other and further relief, both at law and in equity, to which they may show themselves justly entitled.

## VI.   DEMAND FOR A JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs and the Proposed Class demand a jury trial on all issues so triable.

Dated: January 6, 2021

Respectfully submitted,

_____

Timothy A. Nelson (Bar No. 016274)
THE NELSON LAW GROUP, PLLC
21 West Coolidge
Phoenix, Arizona 85013
(602) 421-2681

John W. Leardi (*application forthcoming*)
Frank X. Wukovits (*application forthcoming*)
Elizabeth A. Rice (*application forthcoming*)
BUTTACI LEARDI & WERNER LLC
212 Carnegie Center, Suite 202
Princeton, New Jersey 08540
(609) 799-5150

*Attorneys for Plaintiffs*
*and the Proposed Class*